**Duane FENDER, Plaintiff,**

**v.**

**MEDTRONIC, INC., Defendant.**

**Civ. No. S–94–307–DFL–JFM.**

United States District Court,
E.D. California.

April 27, 1995.

Bryon Damiani, Jr., Matheny, Poidmore & Sears, Sacramento, CA, for plaintiff.

Janet L. Grove and Dean Fishman, O'Connor, Cohn, Dillon & Barr, San Francisco, CA, for defendant.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

This case presents difficult questions as to the scope of preemption under the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 321–394. The devices particularly at issue—pacemaker leads—are Class III devices, the most sensitive classification, but were not required to go through the Food and Drug Administration's ("FDA") exacting premarket approval process. The scope of preemption in this context is unresolved in the Ninth Circuit. In bringing this summary judgment motion, defendant Medtronic seeks a ruling that the FDA's regulations governing the substantial equivalence process, 21 C.F.R. §§ 807.81–807.100, and good manufacturing practices, 21 C.F.R. §§ 801 & 820, preempt plaintiff Fender's personal injury and liability claims.

### I

On October 28, 1985, due to his symptomatic radial arrhythmia, plaintiff Duane Fender received a Medtronic dual chamber Model 7006 implantable pulse generator, a Model 4012 ventricular lead, and a Model 4512 atrial J-lead. In late September 1991, Medtronic began contacting physicians, including Fender's surgeon, about performance problems with the Model 4012 lead. Fender met with his surgeon and a representative from Medtronic in November 1992, to evaluate the leads and the pacemaker. At that meeting, it was recommended that the Model 4012 lead be replaced along with the pacemaker, which was approaching the end of its expected performance life. Because Fender was apparently symptom-free and not pacemaker-dependent, he decided to schedule the replacement surgery for April 1993. On December 1, 1992, a Patient Services Manager from Medtronic wrote to Fender explaining the reasons for replacing the Model 4012 lead and Medtronic's replacement and reimbursement policies.

On April 7, 1993, Fender underwent surgery to replace the Model 4012 lead and to remove the Model 7006 pacemaker. During the surgery it was determined that the Model 4012 lead was not functioning and that the atrial J-lead Model 4512 might be in the early stages of failure and should also be replaced. After taking out the old pacemaker, the two old leads were capped and an atrial J-lead Model 5524 and a ventricular lead Model 5024 were implanted and attached to the new Model 7086 pacemaker. There were no complications with the surgery.

On November 29, 1993, Fender filed suit against Medtronic in Placer County Superior Court alleging personal injury based on products liability. Fender alleges that he has suffered wage loss, hospital and medical expenses, general damage, and loss of earning capacity. Plaintiff's first and only cause of action is for products liability. According to the complaint, Fender was injured by the pacemaker and both leads which were defective when they left Medtronic's control.

Fender alleges strict liability for design defect and manufacturing defect; negligence; and breaches of both an implied warranty and an express written warranty.

On March 1, 1994, Medtronic filed a notice of removal based on diversity of citizenship. Medtronic now moves for summary judgment arguing that plaintiff's claims are preempted in full by the MDA. For the reasons stated below, summary judgment is granted in part and denied in part.

## II

■ The MDA, enacted in 1976, gives the FDA comprehensive regulatory authority over medical devices. *See* 21 U.S.C. §§ 360c–3601. The Act puts into place an approval and regulatory process that varies in stringency according to the threat the device may pose to human health. The Act establishes a threefold classification system for medical devices:

Class I devices pose little threat to the public health and safety and are subject only to general controls on manufacturing. Class II devices are more complex and may be subject to 'the promulgation of specific performance standards, should the FDA deem them a sufficient health hazard as to require strict product specifications or warnings.' Class III devices present a potential unreasonable risk of illness or injury and thus require premarket approval, a stringent process requiring the manufacturer to submit detailed information to an FDA panel of experts.

*Anguiano v. E.I. Du Pont De Nemours & Co., Inc.*, 44 F.3d 806, 810 (9th Cir.1995), quoting *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1418–19 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993). Although as a general rule a Class III device must obtain premarket approval ("PMA") before it can be marketed to the public, 21 U.S.C. § 360e, 21 C.F.R. § 814, there is an exception for Class III devices that are substantially equivalent to devices on the market before the MDA became effective on May 28, 1976. 21 U.S.C. § 360e(b). As to these devices, the applicant must seek approval from the FDA through the premarket notification process. 21 C.F.R. §§ 807.81–807.100. If the applicant persuades the FDA that the device is substantially equivalent to a device on the market before May 28, 1976, the device may be sold until such time as the FDA requires the device to go through the PMA process.[1]

In this case, both the pacemaker and its leads are Class III devices. 21 C.F.R. §§ 870.3610, 870.3680. The FDA gave premarket approval for the Medtronic pacemaker implanted in Fender. The ventricular and aortal leads, however, were determined to be Class III devices "substantially equivalent" to pre-MDA devices and thus were exempted from the PMA process.

## III

Medtronic argues that regardless of whether Fender's devices were approved through the PMA process or the substantial

1. The two processes are described and contrasted in *Reeves v. AcroMed Corp.*, 44 F.3d 300, 303 (5th Cir.1995):

The [MDA] establish[es] two separate approval processes for medical devices: Pre–Market Approval and Pre–Market Notification. The FDA's Pre–Market Approval process ... is lengthy and involves extensive investigation by the FDA. The FDA's Pre–Market Approval application requires manufacturers to submit extensive animal and human data to establish their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental program under close FDA scrutiny must be successfully completed before FDA approval can be obtained under this process. FDA regulations also require Pre–Market Approval applicants to submit '[c]opies of all proposed labeling for the device.' 21 C.F.R.

§ 814.20(b)(10). The FDA approves a Pre–Market Approval application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.

In contrast ... the agency's Pre–Market Notification process is more abbreviated and involves less FDA oversight.... The Pre–Market Notification process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent.... Pre–Market Notification applicants must also submit their proposed labeling. [21 C.F.R. § 807.87]. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the [MDA] in 1976, the applicant is free to market the device.

equivalence process, all of plaintiff's claims are preempted in full under the preemption clause of the MDA, which provides that:

no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).[2] The regulations implementing the MDA somewhat narrow the sweep of § 360k(a):

State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d). In *Anguiano*, the Ninth Circuit noted that in passing the MDA, "Congress expressly intended to preempt state tort law." *Anguiano*, 44 F.3d at 809. Thus, the preemption provision applies with equal force to state common law tort claims as to state regulatory schemes. However, "the MDA does not preempt all state laws relating to medical devices. Rather, 'the scope of preemption is limited to instances where there are specific FDA requirements applicable to a particular device.'" *Id.* (quoting *Moore v. Kimberly–Clark Corp.*, 867 F.2d 243, 245 (5th Cir.1989)).

▇▇▇▇ Although the law in this area is still unfolding, certain generalizations seem fairly safe as to preemption under the MDA. First, tort claims relating to the manufacture, design, or labeling of Class III devices that have gone through the PMA process are preempted. *See e.g., Stamps v. Collagen*

*Corp.*, 984 F.2d 1416, 1420–21 (5th Cir.1993). The PMA process is itself a "specific requirement[ ] applicable to a particular device" under the FDA's preemption regulation. *Id.* at 1422 n. 3. On the other hand, tort claims relating to a Class II device, which is not subject to the PMA process, will not be preempted unless there are specific regulations for the device that relate to safety or effectiveness. Thus, identification and classification regulations for Class II devices do not constitute specific requirements that preempt state law. *See Anguiano*, 44 F.3d at 810 (contrasting more extensive requirements for Class III devices than for Class II devices). Finally, claims based upon inadequate labeling will be preempted as to all Class III devices—PMA and premarket notification devices alike—because the regulations governing premarket notification subject the proposed label to extensive FDA inspection. *See Reeves v. AcroMed*, 44 F.3d 300 (5th Cir.1995); *Mendes v. Medtronic, Inc.*, 18 F.3d 13 (1st Cir.1994).

There are two issues within the preemption analysis that are less than clear under the cases and as to which there is some disagreement. The first question is whether design and manufacturing tort claims are preempted as to Class III devices that only go through the premarket notification process. The argument for preemption seeks to equate the premarket notification process with the PMA process and also, as to manufacturing defect claims, relies on the good manufacturing practice requirements set forth in the statute, 21 U.S.C. § 360j(f), and by regulation, 21 C.F.R. § 820. *Compare Mendes v. Medtronic, Inc.*, 18 F.3d 13 (1st Cir.1994) *with Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273, 1281–82 (1992) *and Ginochio v. Surgikos, Inc.*, 864 F.Supp. 948 (N.D.Cal.1994). The second question is whether a tort claim can go forward as to a Class III device if the plaintiff alleges that the device has been made in violation of FDA regulations or if the plaintiff relies on a theory of negligence per se

**2.** Section 360k(b) allows a State to impose more restrictive requirements, but only upon application to the Food and Drug Administration ("FDA") for exemption from the preemption rule. California has not applied for such an exemption with respect to its products liability laws.

such that state tort law adopts the standards set forth in the FDA regulations. *See Reeves,* 44 F.3d at 306–307; *Mendes,* 18 F.3d at 19 & n. 4; *Reiter v. Zimmer,* 830 F.Supp. 199, 204 (S.D.N.Y.1993); *Evraets v. Intermedics Intraocular, Inc.,* 29 Cal.App.4th 779, 34 Cal.Rptr.2d 852, 859 (1994). Arguably such claims would not be "different from or in addition to" federal requirements since state law would merely incorporate federal standards.

■ As to the first question, except for claims based upon labeling, no appellate court has found that the premarket notification process for Class III devices preempts claims based upon design or manufacture in the same way that the PMA process does.[3] Unlike PMA approval, premarket notification cannot be considered a "specific requirement[ ] applicable to a particular device." 21 C.F.R. § 808.1(d). Whereas the PMA process entails close FDA scrutiny of the device for safety and leads to approval of the device, the premarket notification process leads only to an FDA finding of substantial equivalence to a device already on the market. The regulations provide that a finding of substantial equivalence "does not in any way denote official approval of the device. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding." 21 C.F.R. § 807.97. Although it is perhaps possible that in a particular instance the premarket notification procedure followed by the FDA could be as searching as the PMA process, the materials submitted by Medtronic as to the approval of the leads here do not demonstrate such a searching review by the FDA. Indeed, the materials show only that Medtronic submitted proposed labels and the results of some testing; they do not demonstrate that these materials are comparable to what is required by the PMA process and they do not demonstrate that the FDA used the materials to closely examine the design and manufacture of the

products for safety.[4] In light of the different procedure followed by the FDA for the PMA process and the premarket notification process, the premarket notification regulations are not fairly characterized as "specific counterpart regulations" or "other specific requirements applicable to a particular device" even as applied to Class III devices. 21 C.F.R. § 808.1(d). *Accord Ginochio,* 864 F.Supp. at 955.

■ Similarly, the good manufacturing practices regulations at 21 C.F.R. §§ 820.1–820.198 are not analogous to the PMA process. The regulations are stated in quite general terms. For example, the regulations as to equipment provide that equipment used in manufacturing "shall be appropriately designed, constructed, placed, and installed." 21 C.F.R. § 820.60. The good manufacturing practice regulations also apply to all three classes of devices. Thus, to find that the good manufacturing practice regulations preempt state law claims based on defective manufacture would be to preempt all such claims as to any medical device, even Class I devices such as tongue depressors. This is scarcely the narrow interpretation of express preemption clauses which is required by the "presumption against the preemption of state police power regulations." *Cipollone v. Liggett Group, Inc.,* — U.S. —, —, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). Whereas the PMA process involves close FDA scrutiny of a particular device and then approval of the particular device, the good manufacturing practices regulations are not focussed on particular devices and do not in themselves require FDA scrutiny and approval of a particular manufacturer or its practices. Were there to be such detailed scrutiny of manufacturing practices, the case might well be different, but nothing in the record suggests that Medtronic has been the subject of such a searching review by the FDA with respect to the leads at issue.

For these reasons, neither the premarket notification regulations nor the good manu-

---

**3.** *But cf. English v. Mentor Corp.,* No. Civ.A. 93–2725, 1994 WL 263353 (E.D.Pa. June 13, 1994).

**4.** Medtronic submits a document showing that the FDA later made inquiry concerning the leads

after substantial equivalence was found. The scope and nature of the inquiry are left uncertain. Nor does it appear that the FDA issued any requirements to Medtronic as a result.

facturing practices regulations are sufficiently specific to a particular device to preempt state tort law as a general proposition. Whatever exceptions to this holding may be appropriate in a particular case have not been established by Medtronic here.[5]

■ The second area of uncertainty addresses efforts by plaintiffs to avoid preemption by stating their tort claims in a way that is not "in addition to or different from" federal standards. It is argued that when the manufacturer of a device is out of compliance with FDA regulations there should be no preemption so long as the state cause of action does not impose a different standard. This argument is of some logical force and some courts have been persuaded by it. · See Reiter, 830 F.Supp. at 204. The difficulty with this approach to preemption, however, is that it usurps the FDA's discretionary role in the application and interpretation of its regulations. Presumably it is for this reason that the MDA does not provide for a private right of action. Gile v. Optical Radiation Corp., 22 F.3d 540, 545 (3d Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994); see also Brinkman v. Shiley, Inc., 732 F.Supp. 33, 35 (M.D.Pa.1989) ("The FDCA does not create or imply a private right of action for individuals injured as a result of violations of the Act" (citing Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986))); Talbott v. C.R. Bard, Inc., 865 F.Supp. 37, 53 (D.Mass.1994). Yet, to permit enforcement and interpretation of the MDA through the mechanism of state tort law

effectively would provide such a right of action when the MDA places enforcement and interpretation of its requirements within the discretion of the agency. See Reeves, 44 F.3d at 307.[6] Thus, if there is a specific FDA requirement applicable to a particular device, preemption cannot be avoided by applying federal standards within the state tort action.

## IV

It remains to apply the preemption principles discussed above to the particular allegations made here.

■ In his complaint, Fender pled claims for strict liability for design defect and manufacturing defect, negligence, and breaches of implied and express warranty. At oral argument, Fender's counsel conceded the design defect claim[7] and stated that no express written warranty claim currently was being pursued. Summary judgment therefore is granted as to those claims. If Fender believes he can make a claim for breach of an express written warranty, keeping in mind that breach of warranty claims based on FDA-prescribed labelling are preempted,[8] he shall amend his complaint within 21 days of the date of this order and shall specifically identify the warranty on which the claim is based.

■ Fender continues to assert a claim for breach of the implied warranty of fitness arising from the sale of any consumer good under California law. See Cal.Civ.Code

---

5. For example, if the FDA, in interpreting the good manufacturing practices regulations, had applied them to Medtronic in a certain way that required specific practices, a contrary state law tort standard could be preempted.

6. We ... decline [the] invitation to create an unwieldy exception [to preemption] in cases where manufacturers attempt to mislead the FDA or violate FDA regulations. The [MDA] establish[es] an extensive enforcement scheme under which the FDA bears the primary responsibility for policing violations of its regulations.... Allowing a jury or court to second-guess the FDA's enforcement of its own regulations contravenes Congress' expressly stated intent in § 306k(a) to eliminate attempts by states to impose conflicting requirements on medical device manufacturers.

Reeves, 44 F.3d at 307.

7. Irrespective of preemption, this claim is barred by the State tort law rule precluding strict liability design defect claims for medical implants available only through a physician. See Artiglio v. Superior Court, 22 Cal.App.4th 1388, 27 Cal. Rptr.2d 589, 593 (1994); Hufft v. Horowitz, 4 Cal.App.4th 8, 5 Cal.Rptr.2d 377, 384 (1992).

8. See Reeves, 44 F.3d at 305; King v. Collagen Corp., 983 F.2d 1130, 1135 (1st Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993); Kemp v. Pfizer, Inc., 851 F.Supp. 269, 272–74 (E.D.Mich.1994); but see Ministry of Health, Province of Ontario v. Shiley, Inc., 858 F.Supp. 1426, 1439–40 (C.D.Cal.1994).

§ 1791.1. This claim is not cognizable, however, under California law. Fender's pacemaker and leads are considered "assistive devices" because they are instruments or accessories "used or intended to be used, to assist a physically disabled person in the mitigation or treatment of an injury or disease or to assist or affect or replace the structure or any function of the body of a physically disabled person." Cal.Civ.Code § 1791(p). Although California law does authorize actions based on breach of implied warranties for assistive devices sold at retail, *see* Cal.Civ.Code §§ 1792.2(b), 1793.02, the statutes specifically exclude actions based on the sale of a "surgical implant performed by a physician and surgeon." Cal.Civ.Code § 1793.02(e)(3). Fender cannot, therefore, maintain this claim under California law, and Medtronic is entitled to judgment as a matter of law.

 Plaintiff's remaining claims are for strict liability for manufacturing defect and for negligence in the manufacture of Fender's devices. Under California law, the requirements for stating a claim for strict liability for a manufacturing defect are the same as for negligence:

> In a negligence case the plaintiff has the initial burden of establishing three things. The first is that he has been injured by the product. This is no less true of strict liability.... The second is that the injury occurred because the product was defective; and this also is no less true of strict liability.... The third is that the defect existed when the product left the hands of the defendant; and this again is no less true of strict liability.

6 B.E. Witkin, *Summary of California Law* § 1244 (9th ed. 1988). Thus, the same preemption rule applies to both claims.

Fender makes the claim of manufacturing defect and negligent manufacture of his aortal and ventricular leads.[9] Fender's pacemaker went through the pre-market approval process, but the leads did not. Instead, the leads were classified as Class III devices

"substantially equivalent to devices introduced into interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments." (Letter of R.G. Britain, Assoc. Dir. for Device Evaluation, FDA, Decl. of C.H. Swanson in Supp.Def.'s Mot. Summ.J., Ex. D.) As discussed above, neither the good manufacturing practices regulations nor the substantial equivalence determination are sufficiently specific to the leads to preempt state tort law. Accordingly, Medtronic's summary judgment motion as to the claims of manufacturing defect and negligent manufacture of the leads is denied.

For the reasons stated above, Medtronic's motion for summary judgment is granted in part and denied in part. The claim that the leads were defectively or negligently manufactured may go forward. All other claims are dismissed as preempted by the MDA or as precluded by state tort law.

IT IS SO ORDERED.

---

9. Fender's pacemaker is a Class III device that has been approved through the PMA process. The court does not understand Fender to assert a claim as to the manufacture of the pacemaker that is distinct from its design, and, if he did, the applicable state tort law would be "in addition to" what the MDA and the FDA required through the PMA process.