Charles BOKIS, Plaintiff,

v.

AMERICAN MEDICAL SYSTEMS,
INC., a Minnesota corporation,
d/b/a AMS, Defendant.

No. CIV–94–53–C.

United States District Court,
W.D. Oklahoma.

Jan. 23, 1995.

**750**

Kevin McClure, Oklahoma City, OK, for plaintiff.

Richard M. Eldridge, Tulsa, OK, for defendant.

## MEMORANDUM OPINION AND ORDER

CAUTHRON, District Judge.

Plaintiff, Charles Bokis, has brought this products liability action against defendant, American Medical Systems, Inc. ("AMS"), based on an allegedly defective penile prosthesis manufactured by AMS and implanted in plaintiff. This matter is currently before the Court for consideration of defendant's motion for summary judgment which urges dismissal of plaintiff's claims on the basis they are preempted by federal law. Specifically, defendant submits summary judgment is proper because plaintiff's claims are preempted by the Medical Devices Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360k(a).

### FACTUAL BACKGROUND

As they pertain to the preemption issue addressed in defendant's motion for summary judgment, the material facts are not in dispute.

On January 1, 1991, Charles Bokis was implanted with an Ultrex penile prosthesis manufactured by AMS. On or about November 19, 1991, plaintiff underwent emergency surgery to repair the prosthesis which had failed to deflate.[1]

Plaintiff contends the penile prosthesis was defective in design and was unreasonably dangerous. Plaintiff also claims AMS failed to provide adequate warnings of the dangers and risks of the product and alleges that AMS was negligent, reckless and grossly negligent in the production of the prosthesis and in its handling of the product.

In 1989, AMS submitted its 510(k) Notification with the Food and Drug Administration ("FDA") notifying it of AMS's proposal to market the Ultrex penile prosthesis as a Class III medical device that was substantially equivalent to a predicate device and other commonly available penile prostheses, including a detailed description of testing and evaluation of the AMS prosthesis. After receiving the AMS 510(k) Notification, the FDA requested that AMS perform additional testing and evaluation of the Ultrex penile prosthesis. On July 1, 1989, AMS submitted its Application for an Investigational Device Exemption, Number IDE G890113. AMS proceeded with conducting clinical trials upon the Ultrex penile prosthesis pursuant to the IDE granted by the FDA. On March 27, 1990, AMS resubmitted its 510(k) Notification notifying FDA of AMS's proposal to market the Ultrex penile prosthesis as a Class III medical device that was substantially equivalent to a predicate device and other commonly available penile prostheses. AMS's 510(k) Notification included a detailed description of testing and evaluation of the Ultrex penile prosthesis, including a summary of the findings of the IDE conducted pursuant to FDA authorization. On June 27, 1990, AMS was notified by the FDA that the FDA had "determined the device is substantially equivalent to devices marketed in interstate commerce prior to May 28, 1976." The FDA advised AMS that "You may, therefore, market the device, subject to the general control provisions of the Federal Food, Drug and Cosmetics Act." AMS was advised by the FDA that the Ultrex penile prosthesis was classified as a Class III device and "it may be subject to such additional controls. Existing major regulations affecting your device are found in the Code of Federal Regu-

---

1. According to a letter from defendant to plaintiff's treating physician, "[t]he failure to deflate was due to a hole in the inner silicone layer which resulted from fatigue. This inner cylinder leak allowed fluid to escape to the outer cylinder and allowed the outer cylinder to bulge. The cylinder may have been difficult to deflate be- cause the small hole in the inner layer did not allow fluid to transfer effectively to the reservoir." However, the specific cause of the alleged defect is not germane to the Court's determination of the preemption issue presented in defendant's motion for summary judgment.

lations, Parts 800 to 895." AMS began marketing the Ultrex penile prosthesis in September 1990.

Although FDA has the authority to do so, it has not at any time revoked or suspended AMS's authorization to market the Ultrex penile prosthesis. AMS continues to market the prosthesis which is still classified as a Class III medical device.

Plaintiff claims he first became aware the penile prosthesis with which he had been implanted did not have FDA premarket approval, but had marketing approval only on the basis that it was substantially equivalent to devices marketed prior to 1976, at the time he requested information concerning the Ultrex penile prosthesis from AMS after his prosthesis malfunctioned.

### DISCUSSION

AMS contends the Medical Devices Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360k(a), preempts plaintiff's claims and, accordingly, summary judgment is appropriate as a matter of law. Plaintiff argues the MDA does not preempt his claims and that preemption in this instance would be unconstitutional. To be entitled to summary judgment, AMS must establish there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). For the reasons discussed herein, the Court finds plaintiff's products liability claims are preempted by federal law and that defendant is entitled to judgment as a matter of law.

### 1. THE MEDICAL DEVICES AMENDMENTS

The FDA was granted comprehensive control over medical devices following the enactment of the MDA in 1976. The MDA has been recognized as a reflection of "Congress's balancing the need for regulation to protect public health against its interest in allowing new and improved devices to be marketed expeditiously without the costs attributable to an excess of regulation." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 14 (1st Cir.1994), quoting *King v. Collagen Corp.*, 983 F.2d 1130, 1138–39 (1st Cir.1993) (Aldrich, J., concurring), *cert. denied*, ——

U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993).

Under the MDA, devices are classified into one of three categories in order to provide a reasonable assurance of their safety and effectiveness. 21 U.S.C. § 360c. Although general controls, including labeling requirements and good manufacturing practices, apply to all three classes, additional regulations are imposed on the Class II and III devices. Class I devices present the least risk of harm and are loosely regulated and subject to only the general controls. 21 U.S.C. § 360c(a)(1)(A). Tongue depressors and crutches are examples of Class I devices. Class II devices, which include artificial knee joints and tampons, may be subject to heightened regulation under the MDA if the FDA determines they are sufficiently dangerous. 21 U.S.C. § 360c(a)(1)(B). Class II devices, however, are not regulated to the extent Class III devices are. Class III devices, such as pacemakers, artificial heart valves, contact lens solutions and the penile prosthesis involved in this case, are deemed to pose the greatest risk of illness or injury and are subject to the most regulation of the three classifications. 21 U.S.C. § 360c(a)(1)(C).

A Class III device may only be marketed and sold if the FDA approves it for marketing by granting FDA premarket approval or by excepting the device from the premarket approval process by either: (1) finding the device is substantially equivalent in design and function to devices on the market before the MDA became effective in 1976, 21 U.S.C. § 360e(b)(1); or (2) granting an investigational device exemption ("IDE") permitting the device to be clinically tested on humans, 21 U.S.C. § 360j(g). A device which is found to be substantially equivalent to a pre-MDA device is entitled to bypass the premarket approval process under the MDA. The FDA may, however, issue a regulation requiring the device to undergo the formal approval process.

In this case it is undisputed that the Ultrex penile prosthesis did not obtain FDA premarket approval. The prosthesis was found by the FDA to be substantially equiva-

lent to devices marketed prior to May 28, 1976, the year the MDA became effective. Furthermore, AMS was granted an IDE pursuant to which it could conduct clinical trials of the prosthesis without having to first obtain FDA premarket approval. The implantation of plaintiff's prosthesis does not appear to be part of AMS's clinical program under the IDE, but was instead implanted after AMS received marketing approval in response to its 510(k) Notification and as a result of the FDA's substantial equivalence determination.

## 2. FEDERAL PREEMPTION UNDER THE MDA

 Under the Supremacy Clause of the United States Constitution, state laws that conflict with federal statutes and regulations are preempted by federal law. U.S. Const. art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Preemption is to be determined according to the intent of Congress. Such intent may either be express or implied. *See, e.g., Id.* ("Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'") (Citations omitted).

It is unnecessary to address the issue of implied preemption, as the MDA contains an express preemption provision. Section 360k(a) provides:

(a) **General rule**

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

The reach of the MDA's preemption has been defined as "broad, but limited." *King v. Collagen Corp.,* 983 F.2d at 1134. The FDA has interpreted preemption to occur under Section 360k only when specific counterpart regulations applicable to the particular device have been enacted. 21 C.F.R. § 808.1(a).

Section 360k has also been interpreted to include not only positive state legislative enactments that create safety and effectiveness requirements different from or in addition to the MDA's requirements, but also a state's common law if it results in different or additional requirements. *See, e.g., Mendes,* 18 F.3d at 18; *King,* 983 F.2d at 1135; 21 C.F.R. § 808.1(b).

 Since *Cipollone,* the overwhelming majority of courts faced with the MDA preemption issue have held state law claims that impose requirements different from, or in addition to, the requirements of the MDA are preempted under federal law. *See, e.g., Martello v. CIBA Vision Corp.,* 42 F.3d 1167 (8th Cir.1994); *Mendes,* 18 F.3d 13 (1st Cir. 1994); *King v. Collagen Corp.,* 983 F.2d at 1134; *Stamps v. Collagen Corp.,* 984 F.2d 1416 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993).[2] Neither the United States Supreme Court, nor the Tenth Circuit Court of Appeals has yet determined the preemptive effect of the MDA.

## 3. DISTINCTION BASED ON FORM OF FDA APPROVAL

As has been previously addressed herein, a device may be marketed without going through the FDA premarket approval process. Many devices, including the penile prosthesis at issue here, are marketed with FDA approval on the basis of a substantial equivalence determination by the FDA.

A 510(k) Notification is required to be submitted to the FDA at least 90 days prior to the date the manufacturer of the medical device intends to market the product. It must contain "an adequate summary of any information respecting safety and effective-

---

**2.** The Court also notes the significant number of federal district courts that have addressed this issue within the last two years and that the overwhelming majority of these courts have ruled in favor of preemption. Defendant cites several of these cases at pages 11 and 12 of its brief in support of summary judgment.

ness or state that such information will be made available upon request by any person." 21 U.S.C. § 360c(i)(3)(A). The summary is required to contain "detailed information regarding the data concerning adverse health effects." 21 U.S.C. § 360c(i)(3)(B). FDA regulations require a significant amount of information concerning the device to be included in a 510(k) Notification, including the device's name; the manufacturer's registration number; the classification of the device; actions taken to comply with MDA performance standards; proposed labels, labeling and advertisements sufficient to describe the device, its intended use, and the directions for its use; a statement indicating similarity to and/or difference from comparable devices in commercial distribution and data to support the statement; and any additional requested information regarding the device. 21 C.F.R. § 807.87. When a substantial equivalence determination is made by the FDA and a device is subsequently marketed, the FDA clearly advises the substantial equivalence determination does not denote official FDA approval of the device. 21 C.F.R. § 807.97.

On this basis, plaintiff seeks to distinguish defendant's argument and the long line of recent case law holding common law claims are preempted by the MDA. Because the premarket approval process is more rigorous than the substantial equivalence determination, plaintiff argues products liability claims concerning a device which is marketed pursuant to only a substantial equivalence determination are not preempted by the MDA.

In *Mendes*, the plaintiff brought a products liability suit against the defendant pacemaker manufacturer, alleging claims for design defect, failure to warn, and manufacturing defect. Summary judgment was entered in favor of the defendant on the basis that the express preemption clause of the MDA preempted the plaintiff's state law claims. As is the case with the penile prosthesis here, the pacemaker in *Mendes* was classified as a Class III device and was marketed pursuant to a substantial equivalence finding by the FDA. While the court found plaintiff to have abandoned her design defect claim and did not address that issue, it ruled that both the inadequate warnings and manufacturing defect claims were preempted because, if successful, they would impose requirements on the pacemaker "different from, or in addition to" those in the MDA.

With regard to the inadequate warnings claim, *Mendes* recognized the FDA regulates the content and appearance of labels on devices such as plaintiff's pacemaker. *Id.*, citing 21 C.F.R. §§ 801.1, 801.15, 801.109. Although the state law standard concerning labeling requirements resembled the federal requirements, the court found the two standards may differ as applied, and a label in compliance with FDA requirements may be found by the factfinder to be deficient under state law. Accordingly, the state standard was found to be "in addition to" the FDA requirement under the MDA. *Id.*

*Mendes* also held plaintiff's manufacturing defect claim to be preempted by FDA's regulations on good manufacturing practices. *Id.* at 19, citing 21 C.F.R. §§ 820.1–820.198. The FDA's good manufacturing practices "require manufacturers to develop and implement 'appropriate,' 'adequate,' or 'sufficient' quality control, quality assurance, personnel training, environmental controls, equipment maintenance, testing, inspection, and storage and distribution procedures, to assure that devices are safe and effective." *Id.*, citing 21 C.F.R. §§ 820.1, 820.5, 820.20, 820.25. These standards were found to differ from the common law duty "to use reasonable care in inspecting, testing, and producing pacemakers." *Id.*

Finally, plaintiff's implied warranty claim was also preempted by the MDA because under state law, if a manufacturing defect rendered the pacemaker unreasonably dangerous, the defendant manufacturer could be found liable even if FDA good manufacturing practices and regulations were meticulously followed. *Id.*

*English v. Mentor Corp.*, No. CIV.A. 93–2725, 1994 WL 263353 (E.D.Pa. June 13, 1994) (unpublished), addressed identical issues to those raised by defendant's motion in this case. In *English*, the plaintiff brought a products liability case against the defendant based on an allegedly defective penile prosthesis manufactured by the defendant and

implanted in the plaintiff. Plaintiff's complaint alleged claims of strict liability, negligence in the design, manufacture, labelling, and marketing of the prosthesis and breach of implied and express warranties of merchantability. The penile prosthesis was marketed pursuant to a FDA finding of substantial equivalence. It had not been granted FDA premarket approval.

In response to the defendant's motion for summary judgment, plaintiff argued his state law claims were not preempted because premarket approval had not been granted and the device had only been marketed based on the FDA's finding of substantial equivalence. Plaintiff argued that because the substantial equivalence process is less rigorous than the premarket approval process it did not result in a specific "requirement" under the MDA. Consequently, the issue the *Mendes* court found unnecessary to address was squarely before the court in *English:* "[W]hether the MDA's substantial equivalence process is, like the [premarket approval] process, a 'requirement' within the meaning of § 360k(a) that preempts state requirements, including common law causes of action, relating to the safety or effectiveness of a device." *Id.* at 3. The court found preemption was warranted even where the allegedly defective device was marketed pursuant to a finding of substantial equivalence and did not have FDA premarket approval:

> For although that process may not be as rigorous or complex as the [premarket approval] process, '[t]he requirements and regulations for permission to market a medical device [pursuant to a substantial equivalence determination] constitute specific regulations made applicable to inflatable penile implants and relate to the safety or effectiveness of the device.' *Rutland* [*v. Mentor Corp.*, No. 20,235 (Harrison County, Miss.Cir.Ct. Feb. 23, 1994)], slip op. at 4 [1994 WL 454741, at *1]. Here, as was the case in *Duvall* [*v. Bristol–Myers*, No. S

93–1072, 1994 WL 591534 (D.Md. March 30, 1994)], Mentor's 510(k) Notification was supported with clinical test data subject to FDA scrutiny before marketing approval was bestowed—specifically, Mentor's 510(k) Notification incorporated its FDA-approved IDE application that contained extensive information, including a nine-month clinical evaluation, relating to the prosthesis's safety and effectiveness.

*Id.* at 8.

*English* is very similar to the present case. Although in no way bound by the above authority, this Court finds *Mendes* and *English* to be persuasive on the issue of whether state law claims are preempted by the MDA when FDA marketing approval is based only on a substantial equivalence determination, and holds that this distinction alone does not preclude federal preemption. *Accord Bollier v. Medtronic, Inc.*, No. Civ.A. H–92–2439, 1993 WL 734843 at 1 (S.D.Tex. Oct. 28, 1993) (unpublished) (plaintiff's state law claims for defective design, manufacturing and marketing of allegedly defective pacemaker implant were preempted by MDA despite FDA marketing approval through the 510(k) Notification process) ("Although the 510(k) process is not as comprehensive as that imposed through the PMA the requirements are substantial."). *Cf. Anguiano v. E.I. Du Pont De Nemours & Company, Inc.*, 44 F.3d 806, 810 (9th Cir.1995) (state law requirements concerning Class II device not preempted although as to Class III device they would be, "[b]ecause of the more extensive requirements imposed on Class III devices, the MDA preempts state law regarding a Class III device even if the only MDA regulation specifically addressing the device is an identification regulation"); *Oliver v. Johnson & Johnson, Inc.*, 863 F.Supp. 251, 255 (W.D.Pa.1994) (recognizing holding of *English* but rejecting its application to Class II device).[3]

---

**3.** In *Oja v. Howmedica, Inc.*, 848 F.Supp. 905, 907 (D.Colo.1994), the court declined to follow the reasoning of *Mendes* based on the belief *Mendes* resulted in "preemption of *all* state product liability claims involving medical devices, because all medical devices are subject to the Act's general controls." Although it is difficult to conclusively determine from the opinion whether

the hip replacement implant was a Class III medical device, because it was marketed pursuant to a 510(k) Notification this Court can assume the hip replacement device was so classified. If the medical device was a Class II device, *Oja* could be distinguished from the present case on that basis. However, regardless of the classification of the hip replacement device, this Court

## 4. PREEMPTION OF PLAINTIFF'S CLAIMS UNDER THE MDA

Based on the preceding analysis, the Court must determine whether plaintiff's state law claims are preempted by the MDA. The claims are preempted if the state law requirements are different from, or in addition to, the FDA requirements under the MDA and relate to the safety or effectiveness of the device or to any other requirement under the MDA. Clearly, each of the state law requirements relate to the safety or effectiveness of the device. The Court will therefore focus its analysis on whether the state law requirements are different from, or in addition to, the MDA requirements.

### A. Plaintiff's Design Defect Claim

■ Plaintiff's design defect claim is preempted for the reasons set forth in Section 3, above. As part of the 510(k) Notification process, AMS submitted and the FDA reviewed significant information concerning the safety and effectiveness of the Ultrex penile prosthesis. Although the substantial equivalence determination does not denote FDA approval of the device, the determination is reached after significant scrutiny by the FDA. Here, the FDA even requested further information and testing concerning the AMS prosthesis before making its determination. In response to the FDA request, AMS submitted additional information, including detailed testing results from the IDE clinical testing program performed on the prosthesis. In this instance, the Court finds the FDA's pre-market finding of substantial equivalence does constitute a "requirement" under the MDA.

Liability under state law would require a finding that the Ultrex penile prosthesis was unreasonably dangerous. *See, e.g., Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla.1974). Such a finding would be contrary to the determinations necessarily made by the FDA under the MDA. As such, the

state law requirements would be "different from, or in addition to," the MDA requirements. Plaintiff's design defect claim is therefore preempted.

### B. Plaintiff's Negligent Manufacturing and Handling Claim

■ Plaintiff's claim for negligent manufacturing and handling of the device is preempted by the good manufacturing practices of the MDA. As discussed in *Mendes,* the duties imposed under common law, although analogous to the FDA's good manufacturing practices, are not identical. Under state law, the factfinder applies a standard of reasonable care. Application of this standard, rather than the standards imposed by the MDA, may result in liability under state law, despite defendant's compliance with the FDA's good manufacturing standards. Plaintiff's negligence claim is therefore preempted by the MDA.

### C. Plaintiff's Inadequate Warning Claim

■ The FDA specifically "regulates the content and appearance of prescription medical device labels." *Mendes,* 18 F.3d at 18, citing 21 C.F.R. §§ 801.1, 801.15, 801.109. Liability for failure to adequately warn would require a finding that the labels and warnings used by AMS and in compliance with FDA regulations under the MDA were insufficient. Clearly, any further requirement is "different from, or in addition to" those required by the MDA.

### D. Constitutionality

Although plaintiff argues preemption of his claims would be unconstitutional, he offers no support for this general assertion. Rather than being unconstitutional, the Court finds preemption flows directly from the Supremacy Clause of the Constitution and, for the reasons addressed above is not only constitutional in general, but is also proper in this case.[4]

---

chooses not to interpret *Mendes* as broadly as the court does in *Oja* and, finding the 510(k) Notification process to be a requirement applicable to penile prosthesis devices, reaches a result in the present case contrary to that reached in *Oja*.

4. The Court notes plaintiff's complaint contains no allegations that defendant has failed to comply with the FDA regulations. Furthermore, although defendant briefly addresses preemption of plaintiff's breach of implied warranty claim in its summary judgment briefing, based on a re-

## CONCLUSION

In accordance with the above, the Court finds plaintiff's claims are preempted by the Medical Devices Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360k(a). The motion for summary judgment filed by defendant American Medical Services, Inc., is therefore granted and defendant's motion to bifurcate is moot. Judgment in favor of defendant and against plaintiff will enter accordingly.

IT IS SO ORDERED.

## JUDGMENT

This matter came on for consideration on defendant's motion for summary judgment. For the reasons set forth in the Court's Memorandum Opinion and Order filed this date, defendant is entitled to judgment in its favor.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment enter in favor of defendant and against plaintiff.

view of plaintiff's complaint and additional pretrial filings, the Court does not believe such a claim has been asserted by plaintiff. However, if plaintiff's complaint contained a breach of implied warranty claim, it would be preempted for the reasons discussed above.